UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:05CR00309 CAS (AGF) |
| SCOTT B. WORLEY, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant, Scott B.

Worley. Pretrial matters were referred to the undersigned United States Magistrate Judge

under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and a motion to

suppress statements (Doc. Nos. 12 & 13). In addition, the government filed a motion for

a pretrial determination of the admissibility of statements. (Doc. No. 6). The trial is

scheduled for Tuesday, September 6, 2005, at 9:30 a.m.

An evidentiary hearing was held on June 27 and 29, 2005. The government was

represented by Assistant United States Attorney Carrie Costantin. Defendant was present

and was represented by his retained counsel, Bernard Edelman. At the hearing, the

government presented the testimony of Special Agent Ann Pancoast, a Special Agent

("SA") with the Federal Bureau of Investigation ("FBI"); Inspector Jeff Walter, a Postal

Inspector with the United States Postal Inspection Service ("USPIS"); Detective Ross

Bishop, with the St. Charles County Sheriff's Department; SA James Thompson, with the

FBI; and Detective William McDaniel, a Deputy with the Jefferson County Sheriff's

Department.  The witnesses were cross-examined extensively by defense counsel.  The parties were granted leave to file post-hearing memoranda, after which the matter was taken under submission.

Defendant is charged with three counts of possession of child pornography, two counts of the receipt of child pornography, three counts of transportation of child pornography, and one count of attempted production of child pornography.  The charges arise out of an investigation by the Jefferson County Sheriff's Department in 2003, which resulted in a state search warrant for evidence at Defendant's residence at 4139 Elizabeth, executed in October 2003; an investigation by the FBI in 2004, which resulted in a federal search warrant directed at Defendant's residence in October 2004; and a federal search warrant directed to America Online ("AOL") for information related to Defendant's AOL account, also in October 2004; and an investigation by the USPIS in 2005, which resulted in a federal search warrant issued on May 27, 2005 directed at Defendant's residence.  The final search warrant was executed on May 31, 2005, and Defendant was arrested on that date at a hotel.  Defendant filed a motion to suppress the evidence from each of the search warrants directed at Defendant's residence[1] and a motion to suppress the statements made by Defendant during or after the execution of each of the warrants directed at his residence.

---

[1]  At the hearing, the Court permitted Defendant to assert an oral motion to suppress the evidence seized as a result of the 2004 search warrant directed to AOL.  As set forth more fully below, that motion is now moot as the government has stated that it will not use it at trial, either directly or indirectly as Rule 404(b) evidence, any evidence obtained as a result of the AOL search warrant.

At the evidentiary hearing, based on the government's assessment that the 2003 state search warrant affidavit did not include sufficient information to tie Defendant's email address to the residence to be searched, the government stated that it would not offer any evidence, directly or indirectly through Rule 404(b), seized as a result of the 2003 state search warrant. It also agreed that it would not use any statements made by Defendant related to the 2003 search and would move to dismiss Count I of the Indictment, which arises out of that evidence obtained from the 2003 search of Defendant's residence and computer. The government also stated that it would not offer any direct or indirect evidence obtained as a result of the 2004 search warrant served on AOL. As such, those portions of Defendant's motions are now moot. Because evidence seized from the 2003 state search warrant and statements made by Defendant at that time are referenced in the 2004 and 2005 search warrants, the parties stipulated that certain paragraphs or portions of the paragraphs of the 2004 and 2005 search warrant affidavits should be excised when reviewing those warrants for probable cause. Because the 2004 and 2005 warrants included information about the 2003 search, the effect of the earlier search warrant on the subsequent investigation and warrants remains an issue. As such, the facts related to the 2003 investigation and search warrant will also be discussed below.

Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

# FINDINGS OF FACT

Det. William McDaniel has been a Deputy with the Jefferson County Sheriff's Department for almost nine years. On September 29, 2003, Det. McDaniel received a fax from someone at the National Center for Missing and Exploited Children ("NCMEC") advising that on September 17, 2003, at 17:18, while conducting searches of message boards, they came across a message posted on the board entitled "R@ygold/underage/lolitas/incest/CP". The message was posted by "scotts86monte@aol.com" ("Scotts86") on September 13, 2003 at 02:02:15 hours. The message stated:

> I am Looking for the ENTIRE FULL LENGTH video of VICKY. The very
> young and beautiful girl who is having sex with a man in a hotel room (she
> looks to be between 8 and 11 yrs old). If any one knows where I may
> acquire this video WITH SOUND!!!!!. Please respond to
> scotts86monte@aol.com
>
> thank you

Govt. Ex. 2, p. 4. The fax advised that there is a child victim from a known child pornography series entitled "Vicky," and that the series is a movie which shows an adult male and girl involved in several sexual activities, including oral sex, and at times the child is tied up and seen using a sexual device.

The NCMEC fax advised that an email search had been conducted for "scotts86monte@aol.com." They located one match on Google Web, consisting of a message posted on September 6, 2003, at 01:05:53 hours, on the

"R@ygold/underage/lolitas/incest/CP" message board, by "Scott Worley

(scotts86monte@aol.com)" in which he requested to subscribe to the website, as follows:

> "Dear Sirs I would lke[2] to subscribe to you website so the I may watch
> beautiful girls with men.  Please email me and tell me how I may do so?
> My e-mail is scotts86monte@aol.com
>
> Thank You
>
> Scott"

Id., p. 5.  At note #3 of the fax, NCMEC advised that it found various profiles for

scotts86monte@aol.com discussed more fully in the fax.  The Yahoo profile of the email

address identified an individual named Scott who lived in House Springs, was single, age

31, and self-employed.  The AOL profile also described an individual named Scott, who

lived in Missouri, and whose hobbies and interests were "young beautiful teen girls (18

and Up)" and Sex, which was mentioned several times.  There were other sexually

suggestive comments or responses in the AOL profile as well.  A photograph of an

individual, later identified as Defendant, was attached to one of the profiles.

The NCMEC fax also advised that a database search for the name "Scott Worley"

in House Springs, MO, had resulted in information regarding an individual named Scott

B. Worley at 4139 Elizabeth Dr., House Springs, MO 63051, with other identifying

information including his Social Security account number, telephone number, and

driver's license number. Id.

---

[2]  In this Report and Recommendation, any emails are quoted verbatim, without
any correction of typographical or other errors.

After receiving this information, Det. McDaniel initiated an undercover exchange with Scotts86.  On October 1, 2003, Det. McDaniel, identifying himself as "DT," sent an email to Scotts86 advising that he had the full length "VICKY" movie and asking if he had video or "pics" to trade.  Scotts86 sent a return email that same day advising that he had video clips and pictures that he had downloaded from the net that he could trade, or that he would be willing to pay for the "VICKY" video.  He reiterated that the video needed to be full length and with sound, as he had bits and pieces of it downloaded already, but the sound quality was bad.  He also requested information about the appearance of the girl in the video, because he had several video clips with the title "Vicky."

In response, Det. McDaniel, working undercover as "DT," asked Scotts86 to send a sample picture of what he had to offer and said he would send a copy of the video.  On October 2, 2003, Scotts86 sent an email regarding "Vicky (Sample)," in which he stated he was enclosing a sample of what he had.  Attached to the email was a file which contained a depiction of a young female engaged in sexually explicit conduct.

In addition to the undercover exchange, Det. McDaniel did further investigation to determine the identity of Scotts86.  As part of his investigation, he compared the photograph included in the Yahoo profile of Scotts86 to the Missouri Department of Revenue photograph of Scott Worley, at 4139 Elizabeth Drive, and determined that they were of the same individual.

Based upon his investigation, Det. McDaniel obtained a state search warrant for the computer and its contents and other evidence or records of child pornography at 4139

Elizabeth Drive. In the search warrant application, Det. McDaniel recounted the email posting recited in the NCMEC fax which requested a copy of the Vicky video, and summarized information received from NCMEC regarding the Vicky video. It also recounted the email posting in which Scotts86 requested that he be added to the underage/lolitas/incest website, as well as Det. McDaniel's emails to and from Scotts86 on October 1 and 2, 2003. The affidavit did not reference any of the information received from NCMEC or received as a result of Det. McDaniel's own investigation, tying the Scotts86 email address to Scott Worley or the Elizabeth Drive address. See Govt. Ex. 1.

Based on this application, a state search warrant was issued on October 7, 2003, for Defendant's residence at 4139 Elizabeth Drive. As detailed in the later 2004 federal search warrant application, the search warrant was executed on or about October 8, 2003. After being advised of his <u>Miranda</u> rights, Defendant admitted that he had posted a message on a web board indicating he wanted to obtain child pornography, but said he did not think anyone would respond. Defendant also identified where he kept his child pornography. Defendant's computer was seized, and a forensic examination of the computer revealed numerous images of child pornography. Govt. Ex. 3,¶ 27.

At some point after these events, and prior to October 2004, the exact date of which was not established, a Jefferson County prosecutor contacted an Assistant United States Attorney in the Eastern District of Missouri and inquired whether charges against Mr. Worley might be adopted federally, and the FBI was asked to see if it might pursue a federal case. SA Pancoast indicated interest. She obtained a report from Det. McDaniel that included a copy of his police report as well as the information from NCMEC that

appears as Exhibit 2. Prior to October 2004, SA Pancoast became aware of Det. McDaniel's activities, including his exchange of emails with Defendant, the 2003 search of Defendant's residence and computer, Defendant's admissions, and the fact that child pornography was located through a search of Defendant's computer.

2004 FBI Investigation

SA Pancoast has been with the FBI for approximately 14 years and, as part of her duties, has had occasion to investigate cases involving child pornography. On August 12, 2004, as a result of a wholly independent child pornography investigation, a search warrant was executed for the residence of Donald Paul Kraft in Eureka, Missouri. At the time of the search, Mr. Kraft was interviewed, and he indicated to the agents that he had traded child pornography with an individual at scottz86monte@aol.com ("Scottz86")[3] in House Springs, Missouri. He indicted that Scottz86 had sent him a number of images of child pornography via email a few days prior to the search of his own residence. Mr. Kraft signed a consent permitting the FBI to control his AOL account and assume his AOL identity.

Acting in an undercover capacity, an agent with the FBI signed onto AOL, changed the password for Mr. Kraft's account, and reviewed and captured all of the email and AOL "buddy lists" associated with Mr. Kraft's account. Among the items located in their review of Kraft's account were 20 prior emails with various individuals, most of which had attachments. Included among these were emails from Scottz86 to Kraft on

_____

[3] This is a slightly different email address from the one Defendant used in 2003, which was scotts86monte@aol.com,with an "s" rather than a "z."

August 8 and August 10, 2004, which contained a total of 27 images of child pornography.  This investigation showed that Kraft had sent at least five emails to Scottz86, two of which included video clips of minor females engaged in sexually explicit conduct with adult males, one of which, sent on August 4, 2004, had the file name of "[R@ygold style]-8yoDoggyFuck.mpg."  The undercover FBI agent continued to monitor the chat rooms and observed that Scottz86 continued to appear in the chat rooms.

On or about August 27, 2004, an administrative subpoena was served on AOL regarding Scottz86.  On approximately August 31, 2004, AOL provided information identifying the subscriber as Scott Worley at the 4139 Elizabeth address.  The account was identified as active, and four screen names were associated with the account: enterprise7771, shavedbox5, scottz86monte, and luvsteengirls.  The agents checked the records of the Missouri Department of Revenue and located a Scott B. Worley at the 4139 Elizabeth address, age 33, and possessing a valid Class F, Non-Commercial driver's license.  The agents searched the AOL profile for Scottz86 on September 18, 2004, which described Scottz86 as an individual named Scott, age 33, matching the same description as the DOR records.  The profile stated he was a quadraplagic in a wheelchair, living in House Springs, Missouri, whose favorite gadget was a 2001 Monte Carlo SS, and whose personal quote was listed as "F**k Me Please."

On or about October 2, 2004, Postal Inspector Jeff Walter was apparently contacted, and he confirmed that Scott Worley received mail at the 4139 Elizabeth.  SA

Pancoast thereafter conducted a check of the residence at 4139 Elizabeth and saw three vehicles in the driveway, one of which was registered to Defendant.

SA Pancoast applied for a search warrant of 4139 Elizabeth based upon this information on October 5, 2004. Govt. Ex. 3. The affidavit included a brief summary of information pertaining to Det. Walter's investigation in 2003. Specifically, paragraph 24 of the affidavit summarized the fax Det. McDaniel received from NCMEC and quoted the two postings from scotts86monte@aol.com. In ¶¶ 25-26, the affidavit detailed Det. Walter's undercover email exchange with scotts86monte@aol.com. Paragraph 27 of the affidavit recounted that a search warrant was obtained for the residence, which was executed on October 8, 2003. That paragraph also summarized the admissions made by Defendant at the time of the execution of the warrant and stated that the forensic examination of Defendant's computer revealed "numerous images of child pornography, including, but not limited to an image of a minor female engaged in sexual intercourse and a minor female performing oral sex on an adult male." Id. The remainder of the affidavit in support of the search warrant detailed the Kraft search warrant and interview, the review of Kraft's email account, and the balance of the investigation that followed thereafter. Id., ¶¶ 28-32.

Based on the affidavit, on October 5, 2004, Magistrate Judge Mary Ann Medler issued a search warrant of 4139 Elizabeth and any computer and computer media, for evidence related to child pornography. Govt. Ex. 4.

The search was executed on October 6, 2004, at approximately 7:15 a.m. Approximately seven agents and officers and one photographer executed the search,

including SA Pancoast, Inspector Walter, and a local Jefferson County police detective. Most, if not all, of the officers and agents were dressed in street clothes. Two or three of the agents approached the front door and knocked and, in response to a voice inside asking who was there, announced that they were police and requested that the door be opened. The person inside said, "Wait a minute." After waiting approximately thirty seconds and getting no further response, the agents, concerned that the individual inside might be deleting or destroying information on the computer, forced open the door.

The agents conducted a sweep of the apartment, at which time their firearms may have been drawn. Both Defendant and his father were inside the residence at the time. Defendant's father, who was in a wheelchair, was found exiting the bedroom. The agents were aware, prior to the search, that Defendant was confined to a wheelchair, but had not previously known that Defendant's father was in a wheelchair.

Defendant was found in his bedroom and was in bed. The agents displayed their credentials to Defendant and advised him they had a search warrant looking for child pornography. They told Defendant that he was not under arrest, that he was free to leave, and that he did not have to answer any questions. Defendant agreed to speak to the agents. He advised the agents, however, that it would take him at least one hour to get up and get dressed. They asked if they could interview him while he remained in bed, and Defendant agreed. The agents did not read Defendant his <u>Miranda</u> rights. At the time, Defendant did not appear to be under the influence of any alcohol or narcotics, and he appeared to understand what was being said. Defendant's answers were responsive, and SA Pancoast did not see anything to suggest that Defendant did not understand what was

transpiring.  The agents did not display their firearms at any time during the interview, and no threats or promises were made to Defendant before or during the interview.

The interview of Defendant lasted less than one hour.  It was conducted primarily by SA Pancoast, with SA Thompson and Inspector Walter also present.  Inspector Walter took notes and asked a few questions at the end of the interview.  Defendant made inculpatory statements regarding child pornography that were not fully detailed at the hearing.  He advised the agents that a week or two after the 2003 search of his residence, he purchased a new computer and had begun viewing, downloading and/or distributing images of child pornography again in April 2004, continuing though August or September of 2004.  He admitted that he used the screen name/email address of Scottz86monte@aol.com to view, download, and distribute child pornography.  He stated, however, that on or about October 2 or 3, 2004 – just days before the search –  he deleted all of his child pornography collection from his AOL account and zip disks.

While the interview of Defendant was being conducted, another agent interviewed Defendant's father in another room, and the remaining agents and officers conducted the search.  At the end of the interview, the agents completed a search of the residence and gave Defendant a list of the items taken.  Defendant was not placed under arrest at the time and remained in his bedroom.  The search warrant return, Govt. Ex. 5, details the items that were seized on October 6, 2004.

SA Pancoast testified that although she had received the information from Jefferson County prior to seeking the warrant in 2004, even if she had not received that information, she would have commenced an investigation of Defendant in 2004 based

upon the information she received from the Kraft investigation, which was a wholly

independent investigation.

Because Defendant had advised the agents that he had recently deleted the child

pornography from his computer, SA Pancoast decided to try to obtain information from

AOL. On October 7, 2004, the FBI applied for a search warrant directed to America

Online, Inc., in Dulles, Virginia. The search warrant requested, for the period of October

6, 2004 to the date the warrant was received, all email and other information maintained

by AOL for the email accounts of Scott Worley and the email accounts of

scottz86monte@aol.com, enterprise7771@1ol.com, luvsteengirls@aol.com, and

shavedbox5@aol.com, the four email addresses the FBI had received previously through

its administrative subpoena to AOL. Govt. Ex. 7. The affidavit in support of the search

warrant was identical to the affidavit in support of the 2004 search warrant for

Defendant's residence, except it recounted, in ¶¶ 26-27, the issuance of the 2004 search

warrant for the residence and a summary of the statements made by Defendant on that

day. Magistrate Judge Medler issued the search warrant on October 7, 2004. Govt. Ex.

7. The warrant was likely sent to AOL that day by fax.

AOL responded to the search warrant by providing a CD on which it had copied

records for the listed accounts. Notwithstanding the time limitation in the warrant, AOL

included on the CD information covering the period prior to October 6, 2004. The

records on the CD were reviewed by SA Jim Thompson. The scottz86monte@aol.com

address was the only one of the four to contain child pornography. The records provided

did not disclose any information pertaining to child pornography for the period from

October 6 to the date the warrant was received, but did disclose information related to child pornography for the period prior to October 6, 2004. In the outbox were three emails from August 2004, sent to three separate addresses, which had attachments containing child pornography.

2005 Postal Inspection Investigation

Inspector Jeff Walter as been with the USPIS for approximately two and one-half years. Prior to that time he was a St. Louis County police officer and a probation officer, and as a probation officer he had supervised sex offenders. In May 2005, Inspector Walter was contacted by St. Louis City Detective Lisa Korobey, who is detached to the Regional Computer Crime Education and Enforcement Group (RCCEEG) of Greater St. Louis as an Internet Crimes Against Children (ICAC) Investigator. She advised him she had signed onto AOL in an undercover capacity, had entered the "St. Louis" area chat room, and had observed the screen name "scottz01monte." She had been familiar with the name Scott Worley and the scottz86monte screen name, used by Defendant in 2004, through intelligence information sharing.

Prior to receiving this information from Det. Korobey, Inspector Walter was aware of the results of the 2003 search warrant. He was also aware generally of the contents of the CD AOL produced in response to the 2004 search warrant, but had never personally reviewed the CD. He testified that he would have followed up on this lead from Det. Korobey and would have investigated Defendant even if he had not known the results of the 2003 search warrant or the AOL search warrant; he was familiar with Defendant and

the "scottz86monte" screen name, as he had participated in execution of the 2004 search warrant.

The AOL profile for "scottz01monte" was examined on or about May 16, 2005.  It revealed information similar to the scottz86monte screen name described in the 2004 search warrant application, and the information matched Defendant's description and location.  Under "favorite gadget," it again listed a 2001 Monte Carlo SS.   The profile also included photographs.  Inspector Walter recognized the first image to be a photograph of Defendant Worley, and the second to be a photograph of the 2001 Monte Carlo believed to be owned by Defendant.

On May 16, 2005, Inspector Walter signed onto AOL in an undercover capacity, using the screen name of RRmatisse.  He added scottz01monte to his AOL "buddy list" and initiated contact with scottz01monte, who was then signed on to AOL.  Inspector Walter, posing as RRmatisse, suggested to scottz01monte that they had previously been in a chat together and then gotten on the same list from which they had gotten some "hot photos."  Inspector Walter further stated that his computer had crashed, causing him to lose his collection, and that he had been trying to get some more.  Scottz01monte asked what kind of "pix" RRmatisse had left, and he responded that he had lost everything except VHS and DVDs.  Scottz01monte inquired what was the youngest he had and said he would kill for some stuff on DVDs.  RRmatisse responded that he had all the way down to age 4 or 5, and up to 14 or 15, and scottz01monte expressed interest. Scottz01monte advised that he only had swimsuit pictures and tame stuff, explaining that

his computer had gotten a virus, requiring him to get a new one. Scottz01monte expressed interest in getting "some hardcore stuff on dvd like you have."

During the period of May 16-26, 2005, Inspector Walter, as RRmatisse, continued to chat with Defendant, who was using the screen name scottz01monte. The conversations are set forth, verbatim, in the 2005 application for a search warrant and are summarized below. Gov't Ex. 9. During the course of these chats, Defendant advised that he had recently picked up a 14 year old girl, named Samantha, and graphically described a sexual encounter he said he had had with her. The two continued to discuss what they might be able to trade with or obtain from one another.

On May 18, 2005, scottz01monte contacted RRmatisse and said "I have pix," and asked if he had any. Inspector Walter responded that he had movies. The following day Defendant again contacted RRmatisse and said that he wanted to obtain videos from him, and in response, Inspector Walter sent him a list of available videos, all of which had intentionally graphic and extremely explicit text describing the supposed child pornography depicted on the videotapes. Each description was paired with a random thumbnail-size image of child pornography which was intentionally cropped or blurred to mask any sexually explicit conduct. Scottz01monte indicated an interest in buying some of the videos, and RRmatisse said he would discount the price if Defendant sent him some photos or videos in return. Defendant said he would send a picture, and thereafter emailed the agent six image files. Five contained child erotica, and the sixth depicted a minor female engaged in sexual intercourse. As set forth in the affidavit, the girl in the sixth image is a known victim from the "Heather" series.

During the course of their continued Instant Message (IM) chats, Defendant continued to negotiate for some of RRmatisse's videos. Defendant indicated that he had images of children younger than what he had sent to Inspector Walter and said he had about 12 "hardcore pix." When Inspector Walter suggested that he would discount the videos in exchange for Defendant's images, Defendant said he had approximately 150 pictures that he could send by email. Inspector Walter agreed to discount Defendant's first order by one-half if the images were good, young, hardcore, and ones he had not seen. Defendant agreed and said he wanted to order all of the videos. Later they discussed putting all of the images on a CD.

Defendant also indicted that he had met a man from Kentucky who was willing to let him have sex and do whatever he wanted to do with his six-year old daughter, in exchange for $500. He sent the agent a clothed photograph of the girl. He also stated he had gotten four hardcore images from another individual, but complained that she had not sent the 40 images she had promised. Defendant indicted that he wanted to get the "lusty lolita" video from RRmatisse, and the agent indicted that he would discount the price to $15 if Defendant's pictures were good. Defendant suggested that they meet that day and exchange the CD of images. The agent said he could not meet because he was about to go out of town with his wife and daughter. Defendant asked the daughter's age, and the agent said 11. Defendant then inquired if he had "ever been with her," which the agent did not directly answer, but responded suggestively. Defendant agreed to mail the CD containing the child pornography images, and the agent provided the name of Richard

Matisse and an address in Wildwood, Missouri, for mailing. Defendant noted that was not far from him and said he lived in House Springs.

Defendant continued to discuss the agent's 11-year-old daughter and asked if he had ever considered letting someone be with her. Defendant suggested that he and the agent meet so the agent could get to know him better. When Defendant again brought up the subject of RRmatisse's daughter, the agent sent a photo, obtained from NCMEC for use in undercover investigations. The photograph depicted the face and shoulders of a minor female, fully clothed, in a typical "school photo." Defendant said he would do anything to be with her, and that he had been looking for a dad who would be willing to share his daughter and take photographs of him with the girl. Defendant indicated that the other dad he had mentioned previously lived too far away and had wanted too much money. Defendant offered to pay for a hotel room. Defendant wanted to know how soon he could meet the agent's daughter. He gave the agent his cell phone number and told him to call and let him know when he wanted to do it. Defendant also mentioned that he was in a wheelchair and wanted to know if that would be a problem for the agent's daughter.

On May 23, 2005, Defendant sent an email indicating he had sent the CD of images and a $15 money order for the DVD called Lusty Lolita. He thereafter communicated with the agent to make sure that sending a money order was okay. On May 24, 2005, the agent received a package at his undercover address with a return address of Scott Worley, 4139 Elizabeth, House Springs, Missouri. During the course of his investigation, Inspector Walter confirmed that Department of Revenue records

indicated that Defendant lived at this address.  Inside the package was a computer CD, and approximately 23 of the images were of child pornography.  There was also a $15 money order and a note stating that the package contained the CD and money for the Lusty Lolita DVD.  The catalogue the agent had sent to Defendant described the "Lusty Lolita" video as a 12-year-old girl and a 14-year-old boy having sexual intercourse.  The note from Defendant also stated that Defendant hoped to meet Matisse's daughter soon.

On May 24, 2005, Inspector Walter again engaged in an IM chat with Defendant. Defendant wanted to know how quickly he could get the DVD he had ordered.  Agent Walter wanted to know if Defendant was still interested in "Jess," the name he used for his supposed daughter, and Defendant said he was.  The agent told Defendant he and Jess could meet Defendant in a hotel in St. Charles after his daughter's dance class in St. Peters.  He told Defendant, however, that if his daughter started to "freak out" about it that day, they would just have to drop it, and Defendant said that was fine.  Defendant asked if he could bring "toys," such as a "vibrator or dildo."  When Defendant asked if he had told his daughter about him and inquired if she would be willing, the agent said "she has been before . . . she will be again."  Defendant also asked if the agent was willing to take pictures or videos of Defendant with his daughter, but he responded that he did not have a camera.  Defendant said he had a digital camera and indicated that he had previously taken pictures of his penis with the camera.  In response to the agent's question about what he wanted to do with the pictures, Defendant said he wanted the video for himself, just to watch.  When the agent asked Defendant if he was still able to get aroused, given that he was paralyzed, Defendant said yes, and he thereafter emailed

the agent an image of an erect penis, which he said was his. No firm plans for a meeting were made that day.

On May 26, 2005, Inspector Walter signed onto AOL in an undercover capacity, using a different screen name of Dadezlilangel, and checked to see if Defendant was logged on. He observed that scottz01monte was logged onto AOL and participating in a chat room titled, "dau takes dad load." The agent entered the chat room and saw that scottz01monte had posted a message on several occasions that read, "Scottz01monte:33 M st. Louis area would like to met Dads or Moms with daughter of daughter's IM me." Using the Dadezlilangel screen name, the agent posted a message asking Defendant what age daughter he wanted. Defendant said he wanted 11 and up. The agent responded that he had a 5-year-old and a 21-year-old. Defendant said "maybe younger too" and in response to the agent's question of what he would do, he said "anything andf (sic) everything." Defendant advised the agent using this screen name that he was going to get to have his first girl next week, whom he described as an 11-year-old. Defendant offered to send Dadezlilangel a picture of the girl. He asked the agent if he would send a picture of his 5-year-old, and the agent declined. During the session, the agent received a message from Defendant, and attached to it was the picture of "Jesse" that Inspector Walter, as RRmatisse, had previously sent to Defendant.

On May 26, 2005, Inspector Walter again logged on to AOL as RRmatisse. They arranged to meet at a hotel on the following Tuesday between Mid Rivers and Cave Springs. Defendant offered to pay for half of the cost of the hotel room.

After ending the session on May 26, 2005, the affidavit states that Inspector Walter went to Worley's residence. He saw three vehicles in the yard, one of which was a black 2001 Chevy Monte Carlo. He immediately contacted another detective, who signed on to AOL and who verified that Scottz01monte was still logged on to AOL.

On May 27, 2005, Inspector Walter applied to the undersigned United States Magistrate Judge for a search warrant for 4139 Elizabeth Drive, House Springs, Missouri, and any computers and computer media found therein, seeking evidence of child pornography. Gov't Ex. 9. Paragraph 8 of the affidavit contains five sentences summarizing the 2003 Jefferson County investigation. The first sentence recounts that an investigation was initiated involving Defendant based on the NCMEC tip. The second sentence states that according to Jefferson County, Worley, using the email address of scottz86monte@aol.com,[4] corresponded with an undercover detective and sent the detective an image of child pornography. The next three sentences recount that on October 8, 2003, the officers executed a search warrant at Defendant's address; that Defendant admitted to downloading child pornography, which could be found on his computer and a zip disk; and that child pornography was in fact found on Defendant's computer. There is no further information pertaining to the 2003 investigation contained in the affidavit.

Paragraph 9 of the affidavit describes the search warrant executed on Donald Kraft's residence in August 2004, which is identified as the result of a separate child

_____

[4] This is somewhat incorrect, as defendant used scotts86monte as his email address in 2003, not scottz86monte.

pornography investigation and summarizes the information Kraft provided regarding the trading of child pornography images with scottz86monte@aol.com and the consent he provided. The next paragraph describes the emails that scottz86monte sent to Kraft, and that 27 of the images were of child pornography. Paragraph 11 recites that a search warrant was issued by Magistrate Judge Medler on October 5, 2004, and paragraph 12 recites that Defendant admitted during his interview that he used the email address and received and distributed child pornography via email. In paragraph 13, Inspector Walter states that on February 2, 2005, he received a report of the forensic analysis of Defendant's computer seized in October 2004 and reviewed all of the images. He found approximately 89 images of child pornography on the hard drive and 29 on the seized removable media.

The balance of the affidavit describes Inspector Walter's investigation regarding scottz01monte, set forth above, beginning with the contact from Det. Lisa Korobey. The next 44 pages of the affidavit, pages 7-51, detail Inspector Walter's IM interactions with Defendant, summarized above.

The undersigned Magistrate Judge issued a search warrant for 4139 Elizabeth Drive and any computers or computer media on May 27, 2005 at 11:05 a.m. Gov't Ex. 10. The agents arranged to have someone from the St. Charles County Sheriff's Department pose as Richard Matisse and meet with Defendant, while Inspector Walter and others went to execute the search warrant.

The search warrant was executed by Inspector Walter, together with Postal Inspectors Becky Powers and Brad Leonard, SA Pancoast, and Lt. Rich Lamar, at

approximately 12:15 p.m., on May 31, 2005. Mr. And Mrs. Worley were at the residence at the time. Mrs. Worley answered the door, and the agents identified themselves as Postal Inspectors and said they had a search warrant. After the residence was cleared for officer safety, the agents went to Defendant's room while SA Pancoast stayed with Mr. Worley.

The agents seized Defendant's computer, seven CDs, handwritten directions to the hotel, and some personal papers. There were also printouts of some of Defendant's IM sessions with Inspector Walter and of some of Defendant's IM sessions with others, which were seized. Gov't Ex. 11. Among the papers was a receipt for a $15 money order that matched the date of the money order Defendant sent to Inspector Walter for the video. Although a forensic examination of the computer had not been completed by the time of the hearing, an initial examination of the computer revealed the presence of child pornography.

<u>2005 Hotel Meeting and Arrest of Defendant</u>

While the agents were executing the search warrant, Det. Ross Bishop, who has been with the St. Charles County Sheriff's Department for 16 years and who was advised of the on-line chats with Defendant, arranged to meet Defendant at the hotel, posing as Matisse. No child actually accompanied Det. Bishop to the hotel.

At approximately 10:47 a.m., on May 31, 2005, Det. Bishop called Defendant on his cell phone. The reception was poor, and Defendant requested that he call back on a land line. They had a second call, in which the detective gave Defendant directions to the hotel in St. Peters. The meeting was to take place at noon. At 11:50, Det. Bishop called

Defendant on his cell phone and advised him they were at the hotel. Defendant said he would get to the hotel in 20-25 minutes, and they agreed to meet in the lobby.

Thereafter, Det. Bishop met Defendant in the lobby, identifying himself as Matisse. Det. Bishop was wearing a cell phone that also functioned as a body recorder and recorded their conversations. Defendant asked where his daughter was, and Det. Bishop said she was nervous and went out to the pool to think about it. They went up to a hotel room which was wired for video, and may have been wired for audio as well. Other officers and agents were located in the room next door, with the recording equipment. In the room, Det. Bishop and Defendant discussed the exchange of child pornography, and Det. Bishop gave Defendant a DVD which he identified as the one Defendant had purchased. They also discussed Defendant's plans for Matisse's daughter, and Defendant said he planned to have oral, vaginal, and anal sex if allowed to do so. Defendant said he had a camera in his car, with other items, including toys. Defendant and Det. Bishop went out to Defendant's car and retrieved a large box and a black nylon briefcase.

Back inside the room, Det. Bishop removed some of the items from the box, which included provocative lingerie for "Jesse" to wear. Defendant removed some of the items from the bag, and they continued to discuss the sex that was planned. After approximately 30 minutes, St. Charles officers entered the room, with their firearms drawn, and advised Defendant he was under arrest. They directed him to put his hands up, and Defendant complied. The items from the black bag and the box were seized. The

items seized are listed on Govt. Ex. 14, and included Viagra, vibrators, a paddle, restraints, lingerie, a digital camera, and a shaver.

Defendant was arrested and transported to the St. Charles Sheriff's Department. He was placed in handcuffs as he was transported from the hotel room to the car and was uncuffed to get into the car. The witness did not know if Defendant was handcuffed while he was transported in the car. At the Sheriff's Department, Defendant was taken to an interview room. The room measured approximately 10' x 10' and contained a wide table and chairs. Defendant was in his wheelchair on one side of the table, and was not in handcuffs, and Det. Bishop and SA Jim Thompson with the FBI were on the other side. They presented Defendant with a written advice of rights and waiver form, at approximately 2:03 p.m. Govt. Ex. 12. Det. Bishop read Defendant each of the rights contained on the form, one at a time, and after each asked Defendant if he understood. Defendant said he understood his rights and initialed each of the paragraphs containing his rights. Det. Bishop confirmed that Defendant could read and write and asked Defendant to read aloud the waiver portion of the form. Defendant agreed to waive his rights and speak to the officers, and he executed the waiver form. Defendant did not appear to be under the influence of drugs and alcohol and appeared to understand what was being said to him. No threats or promises were made to induce Defendant's statements.

Defendant thereafter made inculpatory statements regarding the sending of child pornography to Matisse and the meeting with Matisse. The interview of Defendant at the Sheriff's Department was not recorded. With regard to the hotel meeting with Matisse,

Defendant stated that he was planning to meet with Matisse in order to set him up, and that he was planning to turn over the information regarding Matisse to SA Pancoast to try and make a deal on the 2004 charges. He said he had called SA Pancoast a few times, but had not reached her. He also stated that he did intend to have sex. The interview lasted approximately 30-40 minutes.

The detectives asked Defendant if he would like to make a written statement, and Defendant agreed. They told Defendant how to fill out the top of the form, with his name and identifying information, but did not give him any instructions regarding what to put in the written statement itself. The detectives then left the room, and Defendant wrote out a two-page written statement. Govt. Ex. 13. After the written statement was completed, SA Thompson went back into the room, after having consulted with SA Pancoast. He brought up Samantha, the junior high girl Defendant told "Matisse" he had had sex with, and asked if she was real. Defendant responded that he had made her up to impress others on the chat line.

## CONCLUSIONS OF LAW

As set forth above, the government has agreed that it will not use any evidence obtained as a result of the state search warrant issued in 2003 or any statements made by Defendant at the time of the search. For purposes of this Court's analysis, the government has also agreed that the Court should assume such evidence is subject to suppression because the agent failed to include information tying the information to

Defendant's residence and computer.[5]  Because AOL provided the government with

information that exceeded the scope of the warrant, the government made the same

concession with regard to the information received from AOL as a result of the 2004

search warrant served following the search of Defendant's residence.  As such,

Defendant's motions to suppress the 2003 search warrant and statements and the 2004

AOL search warrant are now moot.

     The parties also stipulated that when assessing probable cause, paragraph 27 of the

2004 search warrant affidavit covering Defendant's residence and the last three sentences

of paragraph 8 of the 2005 search warrant affidavit, which portions reference the 2003

search and statements, should be deleted.  The 2005 search warrant affidavit did not

include any information related to the 2004 search warrant served on AOL.

     With regard to the 2004 and 2005 searches of Defendant's residence and

computer, Defendant asserted the following grounds in support of suppression:  (1) the

warrants were improper on their face and/or were illegally issued; (2) the warrants were

issued without a proper showing of probable cause; (3) the information was stale; (4) the

property seized was not described in the warrant; and (5) the scope of the warrant was

impermissibly broad.  Although Defendant did not raise any other grounds for

suppression, either during argument following the hearing or in his post-hearing

---

[5]  An argument could perhaps be made that Det. McDaniel reasonably relied in good faith on the issuance of the warrant, given the information known to him, but not included in the warrant, connecting the child pornography to Defendant's home and computer.  See, e.g., United States v. Martin, 297 F.3d 1308, 1318-20 (11th Cir. 2002), and cases cited there.  In light of the government's concession, however, the Court will not address this argument.

memorandum, inasmuch as the effect of any "taint" from the suppressed evidence was discussed at the supplemental hearing and was addressed in the government's post-hearing brief, the Court will address this issue as well.

Defendant also filed a motion to suppress his statements. Given the government's concession, only the statements made in 2004 and 2005 remain at issue.

**A. 2004 Search Warrant Directed to Defendant's Residence**

(1) Alleged Invalidity

Defendant provides no factual or legal basis for his assertion that the 2004 search warrant was either improper on its fact or invalidly issued, and upon review of the affidavit and warrant, the Court perceives no such basis. The 2004 search warrant was issued by an impartial Magistrate Judge based on information contained in a properly sworn affidavit. The warrant was properly signed and dated by the issuing judge, and it identifies with particularity the place to be searched and the items to be seized. As such, this argument should be denied.

(2) Staleness

Defendant's assertion of staleness likewise lacks merit. As late as August 10, 2004, less than two months prior to the issuance of the search warrant, Defendant sent Mr. Kraft emails containing images of child pornography, and Defendant received an email containing child pornography from Mr. Kraft on August 4, 2004. The agents thereafter confirmed that Defendant maintained the AOL account at issue on August 31, 2004, and that Defendant was receiving mail at the Elizabeth address as late as October 2, 2004.

As the Eighth Circuit has recognized, "There is no bright-line test for determining when information is stale." United States v. McNeil, 184 F.3d 770, 775 (8th Cir. 1999). The timeliness of the information depends on the circumstances of the particular case, including the nature of the crime. United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993). "[T]he lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated." United States v. Horn, 187 F.3d 781, 786 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000) (citing Koelling, 992 F.2d at 822-23); United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996). In the analogous situation of unlawful possession of a firearm, where continued possession of the item is itself unlawful, and the item is one that people tend to keep, the court has recognized that information months or even years old may be sufficiently current.

> We have further held that information four months old, or even three years
> old, may supply probable cause for a warrant to search the home of
> someone suspected of illegal possession of a firearm, because possession is
> a continuing offense and because firearm enthusiasts tend to keep their
> weapons for long periods of time.

Horn, 187 F.3d at 786. Courts, including the Eighth Circuit, have recognized that the possession of child pornography is likewise a continuing offense, and that it is reasonable to believe that one who possessed child pornography at some point would likely still have that child pornography is his possession even months thereafter. See id. at 787; United States v. Hay, 231 F.3d 630, 635-36 (9th Cir. 2000), cert. denied, 534 U.S. 858 (2001); United States v. Rabe, 848 F.2d 994, 995-97 (9th Cir. 1998). In addition, the information in the affidavit setting forth the agent's experience that child pornographers use their

computers and on-line storage facilities as an inexpensive and effective means to collect, create, and/or store pornography with a degree of anonymity (Govt. Ex.3, ¶¶ 12-18), provides further probable cause to believe that Defendant would likely still possess such images. United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002) (agent's testimony from her professional experience that child pornographers generally retain their pornography for extended periods of time held sufficient to provide probable cause for search months after the intercepted transfer); Hay, 231 F.3d at 636. This is especially true as the information received from the 2003 NCMEC fax and Defendant's email exchange with the undercover agent in 2003,[6] coupled with Defendant's exchange of child pornography with Mr. Kraft ten months later, showed a pattern by Defendant and further demonstrated that Defendant was a collector of child pornography.

Even if there were no basis to believe that Defendant would intentionally have maintained any images, the affidavit recounts the experience of those with forensic experience in examining computers that even when one attempts to delete information from a computer, copies of the information or other "footprints" that are retrievable often still remain on the computer. As such, the information set forth in the affidavit was not impermissibly stale.

_____

[6] It is important to note that while the evidence obtained as a result of the 2003 search has effectively been suppressed, the parties agree that there was nothing improper about the investigation leading up to the search. As such, it was wholly proper for SA Pancoast to rely upon and use the information contained in the NCMEC fax and the undercover email exchange that took place between Det. McDaniel and Defendant. During this exchange, Defendant admitted that he had downloaded a large amount of child pornography onto his computer, and he thereafter emailed a sample to the undercover officer.

Finally, even if one assumed, for the sake of argument, that the information was stale, the warrant still would not be subject to suppression because the officers acted in good faith reliance on the warrant. United States v. Leon, 468 U.S. 897, 920-21 (1984); United States v. Rugh, 968 F.2d 750, 753 (8th Cir. 1992). SA Pancoast fully disclosed the dates of the August emails exchanging child pornography, as well as the date when they confirmed the account's nexus to Defendant. Knowing these dates, the Magistrate Judge reasonably determined there was probable cause for issuance of the warrant. The executing officers were entitled to rely, in good faith, on that determination. Rugh, 968 F.2d at 753 (officers executing warrant based on 16-month-old information acted in good-faith reliance on a facially valid warrant).

(3) Probable Cause

This information also provides ample probable cause to support the warrant. The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions. "In dealing with probable cause . . . as the very name implies, we deal with probabilities. These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Brinegar v. United States, 338 U.S. 160, 176 (1949). Probable cause is "a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Applications and affidavits should be read with common sense and not in a grudging, hyper technical fashion. United States v. Ventresca, 380 U.S. 102, 109 (1965). Probable cause may be found in hearsay

statements from reliable persons, Gates, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, Draper v. United States, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, McDonald v. United States, 335 U.S. 451, 454 (1948). While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive. Information contained in applications and affidavits for search warrants must be examined in light of the totality of the circumstances presented. Gates, 462 U.S. at 230. Once a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding. Id. at 236.

Without regard to any evidence obtained as a result of the 2003 search warrant, the affidavit in support of the warrant shows (i) in September 2003, Defendant was attempting to get a video of child pornography, portions of which he already possessed, and was attempting to subscribe to a website referencing underage lolitas and incest; (ii) during his email exchange with the undercover officer in October 2003, Defendant admitted to having child pornography to trade that he had downloaded onto his computer, continued in his efforts to obtain the video, and emailed a file containing child pornography as a sample of what he had to trade; (iii) in August 2004 Defendant used his computer to exchange child pornography with Kraft and had sent Kraft 27 images of child pornography; (iv) the AOL account at issue was subscribed to by Defendant at the Elizabeth address; (v) Defendant was listed as residing at the Elizabeth address and was receiving mail at that address days before the warrant was issued; (vi) those desiring child pornography now typically use computers to access and store their images and videos;

and (vii) even if Defendant attempted to delete the images from his computer, footprints or evidence of the images could likely be recovered from the computer.

This evidence provided a sufficient basis for the Magistrate Judge to conclude that there was a fair probability that child pornography would be found in Defendant's residence or on his computer.  See Horn, 187 F.3d at 786-87 (defendant's statements to an undercover agent that he had corresponded with a woman from Texas who stated she had three "very curious" children, and that she had "initiated" some boys and girls when she babysat, sufficient to provide probable cause to search defendant's home for correspondence, including letters with the woman from Texas).  See also United States v. Tellez, 217 F.3d 547, 549 (8th Cir. 2000) ("Although it is true that neither the informant nor the detective had actual knowledge that contraband was in Mr. Tellez's home, absolute certainty was not necessary:  a fair probability is all that is required.")

From all of the circumstances stated above, the Magistrate Judge had a reasonable basis to believe (i) Defendant both received child pornography from and sent child pornography to others; (ii) Defendant had downloaded and/or saved some images on his hard drive; and (iii) even if Defendant thereafter deleted any images saved, some evidence of those images would likely still be found on his computer.  Horn, 187 F.3d 781.

(4)  "Taint" from 2003 Search

Although Defendant has not expressly asserted that the 2004 search warrant should be suppressed as the fruit of evidence obtained unlawfully from the 2003 search, the Court will nonetheless address this argument, as evidence and statements obtained as

a result of the 2003 search warrant were referenced, albeit briefly, in the 2004 search warrant affidavit.

The "fruit of the poisonous tree" doctrine recognizes that the exclusionary rule can operate to exclude not only evidence obtained as a direct result of a constitutional violation, but also the "indirect use" of unlawfully obtained evidence, in order to deter the use by law enforcement of methods "deemed 'inconsistent with ethical standard and destructive of personal liberty.'" Nardone v. United States, 308 U.S. 338, 340 (1939). The doctrine has both limits and exceptions, however. Courts have long-recognized that "evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is "so attenuated as to dissipate the taint." Segura v. United States, 468 U.S. 796, 805 (1984) (quoting Nardone, 308 U.S. at 341). Another exception recognizes that evidence is not to be excluded if law enforcement officers had an "independent source" for discovery of the evidence. Id.; see Murray v. United States, 487 U.S. 533, 537 (1988); Wong Sun v. United States, 371 U.S. 471, 488 (1963).

As expressed in Wong Sun, the question to be answered in applying the attenuation of the taint doctrine is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun, 371 U.S. at 488. The determination depends on the particular facts of each case. Schneckloth v. Bustamonte, 412 U.S. 218, 248-9 (1973). Among the factors courts examine are the amount of time between the unlawful action

and the acquisition of the new evidence, and the presence of intervening circumstances. United States v. Najjar, 300 F.3d 466, 477 (4th Cir.), cert. denied, 537 U.S. 1094 (2002); United States v. Dickson, 64 F.3d 409, 411 (8th Cir. 1995). Courts also examine the purpose and flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-4 (1975).

It is not entirely clear to the undersigned what test to apply in assessing the impact of the suppression of the 2003 search warrant. Where, as here, a showing is made for the first time on a motion to suppress that some portion of the information in a search warrant affidavit was acquired through a prior illegal search, courts have taken an approach similar to that in Franks v. Delaware, 438 U.S. 154, 171-72 (1978), and have simply held that the validity of the warrant and search depends on whether the untainted information, by itself, establishes probable cause for the warrant to issue. See, e.g., United States v. O'Neal, 17 F.3d 239, 242-44 (8th Cir.), cert. denied, 513 U.S. 960 (1994); United States v. Reed, 15 F.3d 928, 933 (9th Cir. 1994); United States v. Gillenwaters, 890 F.2d 679, 681-82 (4th Cir. 1989); James v. United States, 418 F.2d 1150, 1151-52 (D.C. Cir. 1969). See also United States v. Underwood, 394 F.3d 956, 963-64 (8th Cir. 2004), vacated on *Booker* grounds, 125 S.Ct. 1037 (2005). This approach squares with the notion expressed in Nix, that application of the exclusionary rule should not put police in a worse position than they would be in had they not violated the law. Nix v. Williams, 467 U.S. 431, 447 (1984). Under this test, the 2004 search warrant is plainly valid, as there is more than ample probable cause without reference to the 2003 search warrant or any statements made at the time of the search.

Under a full attenuation analysis, the result is the same, as on these facts the link between any unlawfully obtained evidence in 2003 and the 2004 search warrant is so attenuated that any taint was dissipated. The 2004 investigation occurred a full year after the 2003 search and related to new conduct by Defendant using both a different computer and a different screen name. The 2004 investigation was also conducted by a different law enforcement agency and resulted from an intervening independent investigation, namely the FBI's investigation of Mr. Kraft. At most, the FBI agent was put on notice that Defendant bore watching, but that has never been deemed sufficient to warrant suppression of a later investigation as the fruit of the poisonous tree. See Najjar, 300 F.3d at 479 (not enough for suppression that evidence from original illegal search triggered officer's suspicion or gave direction toward focus of government's later investigation); United States v. Watson, 950 F.2d 505, 507-8 (8th Cir. 1991) (fact information gained during illegal search gives rise to later, independent investigation of same individual, does not necessarily taint the later investigation; nor is it sufficient if illegally gained information merely shortens or facilitates the later investigation); United States v. Friedland, 441 F.2d 855, 861 (2d Cir. 1971) (fact FBI was put on notice regarding defendant from illegal wiretap activity not sufficient to immunize defendant from investigation and prosecution of different criminal activities learned of in lawful way). See also, Wong Sun, 371 U.S. at 487-88 (declining to hold all evidence "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of police).

Further, the latter investigation was not the result of any "exploitation" of any prior illegality. The results of the 2003 search were unnecessary to the later search warrant affidavits. In addition, any infirmity in the 2003 search warrant was the result of negligence or oversight – not misconduct. Prior to obtaining the search warrant, Det. McDaniel already possessed all of the information necessary to establish probable cause for the warrant; he simply neglected to include the information he had developed tying the email account to Defendant and his residence in his affidavit. And the state judge compounded the error by issuing the warrant despite its infirmity.

There is nothing in this record to suggest that the agents and officers involved in the investigations in 2004 and 2005 had any reason to believe that the evidence obtained from the first search might be subject to suppression. Nor was there any incentive for the agent in 2004 to use the "tainted" information; the information was not necessary to establish probable cause, and the warrant in 2004 could not serve to "sanitize" the evidence obtained in 2003. A suppression under these facts would serve no deterrent purpose. See Brown, 422 U.S. at 611 (recognizing no deterrent purpose served with "technical violations" of the Fourth Amendment, such as when officers arrest a defendant in good faith reliance on a warrant later found to be invalid) (Powell, J., concurring).

It is unclear whether the somewhat more stringent test espoused in Murray, dealing with the independent source doctrine, applies here as well. See United States v. Madrid, 152 F.3d 1034, 1040 & n.7 (8th Cir. 1998) (dealing with inevitable discovery exception). In Murray, the Supreme Court held "that a search warrant obtained after an illegal entry is not an independent source of the evidence if 'the agents' decision to seek the warrant was

prompted by what they had seen during the illegal entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.'" United States v. Leveringston, 397 F.3d 1112, 1115 (8th Cir. 2005) (quoting Murray, 487 U.S. at 542). Cases applying the independent source doctrine require that the government establish both (1) that the decision to seek the warrant was independent of the earlier unlawful entry and (2) that the information obtained through the unlawful entry did not affect the magistrate's decision to issue the warrant. See United States v. Khabeer, 410 F.3d 477, 483 (8th Cir. 2005); Leveringston, 397 F.3d at 1115. Cf., Madrid, 152 F.3d at 1040 (applying same factors in "inevitable discovery" context). The government cites to these cases in its post-hearing brief.

For several reasons, however, the Court believes that the Murray test does not apply here. First, courts, including the Eighth Circuit, continued to take the Franks-type approach well after the Murray decision in 1988 when faced with facts similar to those presented here. See, e.g., Underwood, 364 F.3d at 963-64; United States v. Davis, 313 F.3d 1300, 1304 (11th Cir. 2002), cert. denied, 540 U.S. 827 (2003); United States v. Hogan, 25 F.3d 690, 693 (8th Cir. 1994); O'Neal, 17 F.3d at 244. Separate tests are also consistent with the fact that the attenuation of the taint doctrine, the independent source doctrine, and the inevitable discovery doctrine are recognized to be three separate and independent exceptions to the exclusionary rule. See, e.g., United States v. Runyan, 275 F.3d 449, 466 (5th Cir. 2001); United States v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001); Dickson, 64 F.3d at 410; United States v. Durant, 730 F.2d 1180, 1185 (8th Cir. 1984). Moreover, Murray and the Eighth Circuit cases applying this test involved

situations where the primary evidence at issue was observed as a result of an illegal entry and officers thereafter obtained a search warrant to seize that same evidence. See Khabeer, 410 F.3d at 483 ("The independent source doctrine provides that evidence initially discovered during an unlawful search, but later obtained independently through activities untainted by the illegality, may be admitted into evidence") (emphasis added). In such cases it is difficult to argue that any taint had dissipated. Here, the government does not seek to admit or use any evidence initially discovered during the 2003 search, but rather seeks to use evidence discovered one year later that resulted from a new investigation and was prompted by an intervening event.

Even if the test espoused in Murray were applied, however, the result would be the same. As set forth above, the Court finds as a factual matter that SA Pancoast made the determination to seek the warrant as a result of information learned during the later Kraft investigation, and that she would have sought the warrant even if she had not known of the results of the 2003 search. The Court also finds that the results of the search conducted one year prior would have had little impact upon the Magistrate Judge's decision to issue the warrant. See Runyan, 275 F.3d at 467-68 (where information from illegal search was included in affidavit for search warrant related to the same information, case remanded to district court to determine if magistrate judge would have granted the warrant without the illegally obtained information). There was ample current information regarding Defendant's activities as a result of the 2004 investigation, which began with the Kraft investigation. And, the paragraph related to the 2003 search was cumulative of the information obtained from the 2003 investigation leading up to the search, which

included Defendant's admission that he had video clips containing child pornography and an exchange in which Defendant emailed child pornography to an undercover officer.  As such, the 2004 search warrant remains valid even under the test espoused in Murray.

(5)  Scope of the Warrant

In his written motion, Defendant asserts that the scope of the warrant was impermissibly broad, and that property was seized that was not described in the warrant.  Defendant has not suggested the manner in which the search warrant was impermissibly broad, and upon review of the warrant, the Court finds that it is narrowly tailored to information pertaining to child pornography and to evidence of ownership of either the computer or the residence.  As such, Defendant's argument regarding the scope of the warrant has no merit.

With respect to the items seized, Defendant has not identified what property seized was not identified in the warrant.  A review of the warrant return (Govt. Ex. 5) does not suggest any items that are not covered by the warrant.  Without further identification by Defendant of items seized that were not covered by the warrant, the Court can perceive no basis for this contention by Defendant.

**B.  Statements Made in 2004**

While other agents were conducting the search, Defendant made oral statements to SA Pancoast and others.  At the time, Defendant was in his bedroom and in bed.  The agents identified themselves and advised Defendant of the nature of the investigation.  Defendant was advised that he was not under arrest, that he was free to leave, and that he did not have to answer any questions.  Defendant agreed to speak to the agents, and

further agreed to participate in the interview while he remained in bed, having explained to them that it would take him a considerable period of time to get up and get dressed. Defendant was not advised of his rights under Miranda, and at the conclusion of the interview Defendant was not placed under arrest.

Statements made by a defendant who is not given his warnings under Miranda may be suppressed if made in response to police interrogation while the defendant is in custody. Miranda warnings are required, however, if and only if a defendant is placed "in custody" and then interrogated. See Stansbury v. California, 511 U.S. 318, 321-22 (1994); Miranda v. Arizona, 384 U.S. 436, 478-79 (1966); United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). A suspect is considered in custody under Miranda either when he has been formally arrested and is not free to leave the location or when a reasonable person in the suspect's position would have "considered his freedom of movement restrained to a degree that is usually associated with a formal arrest." United States v. Caldwell, 954 F.2d 496, 499 (8th Cir. 1992) (citing Berkemer v. McCarty, 468 U.S. 420, 440 (1984)). Additionally, "[w]arnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Jenner v. Smith, 982 F.2d 329, 335 (8th Cir. 1993) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). Instead, a determination whether a suspect is "in custody" focuses on the totality of the circumstances. Id. The determination is an objective one, which does not turn on "the subjective views harbored by either the interrogating officers or the person being questioned." Thatsaphone v.

Weber, 137 F.3d 1041, 1045 (8th Cir. 1997) (emphasis in opinion) (quoting, Stansbury v. California, 511 U.S. 318, 323 (1994)); accord, LeBrun, 363 F.3d at 720.

In United States v. Griffin, 922 F.2d 1343 (8th Cir. 1990), the Eighth Circuit delineated six "common indicia of custody" to be considered when determining whether a suspect is in custody while being questioned.  The factors identified were:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

Id. at 1349.  "The first three of these factors tend to mitigate against a finding of custody. The last three factors tend to weigh in favor of a finding of custody.  A finding of custody does not, however, have to be supported by all six factors."  United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996) (interim citations omitted), overruled on other grounds by United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004).  A particularly strong showing on one factor may compensate for a weak showing on other factors.  See Griffin, 922 F.2d at 1349.  The Eighth Circuit has since directed that Griffin not be followed ritualistically in every case; the ultimate inquiry must always be whether the defendant was restrained as though he was under formal arrest.  United States v. Czichray, 378 F.3d 822, 827-28 (8th Cir. 2004); LeBrun, 363 F.3d at 720.

Based on these facts, the Court finds that Defendant was not in custody at the time of his statement, and that the agents were therefore not required to advise him of his rights under <u>Miranda</u>. Initially, and perhaps most importantly, Defendant was specifically advised that he did not have to answer their questions, was not under arrest, and was free to leave. <u>See</u> <u>Czichray</u>, 378 F.3d at 826 (noting most significant factor and obvious means of demonstrating suspect has not been taken into custody is to inform him arrest is not being made and that suspect may terminate the interview); <u>United States v. Jones</u>, 630 F.2d 613, 616 (8th Cir. 1980). Although Defendant was restricted to a wheelchair and it would have taken a considerable amount of time for him to get up and dressed, Defendant knew that he was free to advise the agents that he did not wish to speak to them before he got dressed and was mobile. Instead, he specifically and voluntarily agreed to be interviewed while he remained in bed. And while the officers and agents were, in fact, executing the search warrant at the time of the questioning, most of the law enforcement officers were engaged in the search, with only SA Pancoast and two others in the room with Defendant. The interview took place in Defendant's own bedroom, during the daytime, the conversation lasted less than one hour, and no strong-arm tactics were used. As such, it was not "police dominated." <u>United States v. Helmel</u>, 769 F.2d 1306, 1320 (8th Cir. 1985). Finally, Defendant was not placed under arrest when the questioning was concluded and was free to remain in his own home when the agents left. <u>Id.</u> As such, the Court finds Defendant's freedom of movement was not restricted in the manner consistent with a custodial interrogation. <u>See</u> <u>Czichray</u>, 378 F.3d at 827-30 (no custody where defendant instructed not to alert others by phone and not to

go to work, defendant was escorted into bedroom and bathroom, interview lasted nearly seven hours, and defendant advised of negative consequences if he did not cooperate); United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991) (no custody where defendant interviewed in bedroom while search warrant being executed and was instructed not to use telephone).

On these facts, the Court also finds that Defendant's statements were voluntary. "Coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167 (1986). While the Court must examine the voluntariness of the defendant's statements based on the totality of the circumstances, see Haynes v. Washington, 373 U.S. 503, 513-14 (1963), the appropriate test for determining the voluntariness of a confession "is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." United States v. McClinton, 982 F.2d 278, 282 (8th Cir. 1992) (quoting United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989)); accord, United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002). In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. McClinton, 982 F.2d at 282 (citing Connelly, 479 U.S. 157).

On this record, there is nothing to suggest that the agents did anything to overbear Defendant's will. Defendant was not in custody, and no promises or threats were made to induce his statements. There is no evidence that Defendant was under the influence of any alcohol or narcotics, and he appeared to understand what was occurring and the

statements and questions of the agents.  He indicated a desire to cooperate with the agents and cooperated with the interview.  As such, Defendant's statements to the agents in 2004 should not be suppressed.

### C.  2005 Search of Defendant's Residence[7]

Defendant asserted the same stock grounds in support of his motion to suppress the 2005 search warrant, and for reasons similar to those set forth above, the Court finds Defendant's motion should be suppressed.

(1)  Alleged Invalidity

Again, the Court perceives no basis for Defendant's assertion that the 2005 search warrant was improper on its face or invalidly issued.  The 2005 search warrant was issued by the undersigned Magistrate Judge based on information contained in a properly sworn affidavit.  The warrant was properly signed and dated and identified with particularity the place to be searched and the items to be seized.

(2)  Staleness

Nor is there any factual or legal basis for Defendant's assertion that the information used to support the warrant was stale.  Indeed, in his IM chats with the undercover agent, Defendant repeatedly identified himself as a collector of child pornography, purported to have images of child pornography, and admitted to using his

---

[7]  Evidence was also seized from the hotel room on May 31, 2005, but Defendant's motion seeks suppression only of the evidence seized from 4139 Elizabeth that day, and does not reference the hotel room.  Even if Defendant had challenged the search and seizure, the officers had probable cause to arrest Defendant, and the evidence seized from the hotel room was in plain view.

computer for this purpose.  These chats with Defendant took place within days of the issuance of a warrant.

(3)  <u>Probable Cause</u>

Based on the standards set forth above, it is also clear that there is probable cause to support the warrant, without any regard to the last three sentences of paragraph 8, or indeed, with regard to any information related to the 2003 investigation.  As stated above, in his IM chats with the undercover agent, Defendant admitted that he collected child pornography; discussed attempts to trade images and videos with others; and attempted to obtain child pornography from the undercover agent.  He also sent an email to the agent that attached images containing child pornography and later sent a CD containing numerous images of child pornography.  His use of his computer for this purpose is confirmed not only by his chats with the undercover agent, but also by their surreptitious observation of Defendant in other chat rooms.  The use of the scottz01 screen name is irrefutably tied to Defendant and his residence through numerous avenues, including Defendant's own admissions as to his identity and location and the return address used on the package Defendant sent to the undercover agent.  The probable cause to support the warrant is nothing short of overwhelming.

(4)  <u>"Taint" from 2003 Search and AOL Search Warrant</u>

The validity of the 2005 search warrant, notwithstanding the reference in the affidavit to the results of the 2003 search, is even more clear.  First, as set forth above, even if one deletes any reference to the 2003 search, the probable cause to believe that evidence related to child pornography would be found on Defendant's computer and in

his home in May of 2005 is overwhelming.  As such, the evidence is not subject to suppression under the test used in <u>O'Neal</u> and <u>Hogan</u>.

Second, any taint from the 2003 search and the 2004 AOL search warrant was plainly dissipated by this time.  Information pertaining to the 2003 search simply was not material to the search warrant affidavit, and information pertaining to the AOL subpoena was not even mentioned in the affidavit.  The discussion of the 2003 search and statements made by Defendant at the time comprise three sentences of a sixty (60) page affidavit.  Indeed, the entire 2003 investigation is summarized in a single paragraph consisting of five sentences and is best characterized as background information.

Further, the 2005 investigation was conducted by yet a different federal agency and was not prompted by anything found in 2003 or obtained from AOL.  Although Inspector Walter had known of the evidence from the 2003 search and of the results of the AOL subpoena for some time, in May 2005 Inspector Walter was neither conducting nor attempting to conduct any investigation of Defendant related to Defendant's then-current activities.  Rather, the May 2005 investigation was initiated only after Det. Korobey, a detective from the St. Louis City Police Department, contacted Inspector Walter and advised him that she had discovered Defendant to again be on line with a new screen name.  The Court thus finds that the 2005 investigation was prompted by intervening events and was not the result of the 2003 search.

For similar reasons, it cannot be said that the 2005 investigation resulted from any "exploitation" of the unlawfully obtained information, using any definition of the word. There is no evidence to suggest Inspector Walter was aware of any infirmaties in either of

the prior warrants.  And there is nothing to suggest that the evidence resulting from either

warrant was important to his decision to initiate the 2005 investigation and thereafter seek

a warrant.  The evidence from 2003 was too remote in significance to have any real

bearing, and the information from AOL was unnecessary.  Well prior to May 2005,

Inspector Walter had several other lawful sources of information to confirm Defendant's

involvement in child pornography during 2004, including Defendant's emails with Kraft;

his admissions to the agents in 2004; and the results of the forensic evaluation of

Defendant's computer seized in 2004, which revealed 89 images of child pornography

located on the hard drive and 29 images on the seized removable media.  Govt. Ex. 9, ¶

13.  Inspector Walter testified, unequivocally, that he would have initiated the

investigation in May 2005 even if he had not known of the results of either the 2003

search or the 2004 AOL search warrant, and on this record that testimony is wholly

credible.  And once he began his undercover exchange with Defendant, there can be no

question that it was his own undercover exchange that prompted the request for the

search warrant in 2005.  As such, the Court finds that Inspector Walter's decision to seek

the warrant was not the result of any unlawfully acquired information.

Further, the Court finds that there is overwhelming probable cause to support the

2005 search warrant even without paragraph 8 of the affidavit, and that the undersigned

would have granted the search warrant without that information.  Indeed, there can be no

question that the AOL search warrant did not affect the decision to issue the warrant, as

information pertaining to that search warrant was not even mentioned in the affidavit.

Thus, even under the <u>Murray</u> independent source test, the evidence would not be subject to suppression.

Finally, suppression of the evidence obtained as a result of the 2005 search warrant would not serve any deterrent purpose. Again, the detective in 2003 did not engage in any wrongful conduct; at best he made a mistake. Nor did the agents in 2004 encourage AOL to provide more information than what was requested. And even if they can be faulted for examining information that fell outside the scope of the warrant after it was provided to them, that information was in no way exploited by Inspector Walter in any aspect of his subsequent investigation. Suppression of the evidence obtained from the 2005 search would unquestionably put the agents in a far worse position than they would have been absent the unlawfully gained information, and it is not justified on these facts.

(5) <u>Scope of the Warrant and the Seizure</u>

Defendant has not suggested to the Court any basis for his assertion that the warrant was overly broad or that items outside the scope of the warrant were seized, and this Court's review of the evidence suggests no such basis. The warrant is narrowly tailored to permit seizure of (i) Defendant's computer, which there was probable cause to believe both housed child pornography and was used as an instrumentality of the crime; (ii) electronic messages between Defendant and the undercover agent or others relating to the sexual exploitation of children; (iii) images of child pornography; and (iv) documents identifying Defendant as an AOL subscriber or a resident of the Elizabeth Drive address. Govt. Ex. 10. The only items seized were Defendant's computer, 7 CDs, and

Defendant's handwritten directions to the hotel, where he had expressed an intent to sexually exploit a child, and the receipt for the $15 money order. All of these items are clearly covered by the warrant.

### D. Defendant's Statements in May 2005

On May 31, 2005, prior to his arrest, Defendant had conversations at the hotel with Det. Bishop, who was posing as Matisse, which conversations Det. Bishop surreptitiously recorded. As the government correctly notes, such recordings made by a consenting law enforcement officer do not require a court order to be admissible. 18 U.S.C. § 2511(2)(c); Lewellen v. Raff, 843 F.2d 1103, 1115 (8th Cir. 1988). And Defendant was neither under arrest nor in custody at the time the statements were made. As such, there is no basis to suppress the recorded conversations.

Following his arrest, Defendant was advised of his rights under Miranda at the police station, both orally and in writing, and he agreed to waive his rights. Defendant was plainly in custody at the time.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception,

and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. <u>Moran v. Burbine</u>, 475 U.S. 412 (1986). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. <u>Connelly</u>, 479 U.S. at 170; <u>Haynes v. Washington</u>, 373 U.S. 503 (1963). "The requirement that <u>Miranda</u> warnings be given does not, of course, dispense with the voluntariness inquiry." <u>Dickerson v. United States</u>, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of <u>Miranda</u>, are rare." <u>Berkemer v. McCarty</u>, 468 U.S. 420, 433 n.20 (1984). <u>See</u> <u>Dickerson</u>, 530 U.S. at 444.

Here, Defendant was advised of his rights under <u>Miranda</u> both orally and in writing, and he acknowledged that he understood those rights. Defendant is an adult, who at the time was 33 years old. In the written waiver, he acknowledged that he understood what he was doing and was willing to answer questions. Defendant was intelligent enough to be adept at the use of a computer and had prior experience with law enforcement. He did not appear to be under the influence of any drugs or alcohol or to be impaired in any other manner, and he had driven his own car to the hotel. In the written waiver, Defendant disclaimed that any promises were made to him, and there is no evidence that any threats or promises were made to induce his statement or his waiver. Only two agents were in the interview room with Defendant when he waived his rights, he was not in handcuffs, and the agents did not display their weapons. Defendant

thereafter gave a written statement, made in his own handwriting, with no officers in the room. Based on the totality of the circumstances, the Court finds that Defendant's waiver and oral statements were both knowing and voluntary.

## CONCLUSION

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Motion to Suppress Statements [Doc. Nos. 12 & 13] be **denied**.

**IT IS FURTHER RECOMMENDED** that the government's motion to determine the admissibility of statements [Doc. No. 6] be **granted**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).


AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 17th day of August, 2005.